Good morning and may it please the court. My name is Daniel Rubens. I represent the Buyer. Mr. Buyer's conviction for insider trading rests on multiple legal errors, both evidentiary and relating to venue. I want to begin with the government's use of a cell phone analysis to prove an essential part of its case, whether Mr. Buyer had material non-public information when he traded a Navigant stock. The government introduced that analysis through a substitute witness, Jessica Volchko, who had nothing to do with the report's creation. She was just handed excerpts of the trial and then testified about them. That procedure violated the confrontation clause and the rules governing authentication and lay witness testimony. There was no good reason for the government to have relied on this roundabout, improvised procedure to get this critical evidence in, and its error in doing so was highly prejudicial. Could you help me understand where the testimonial statement is in the introduction of this document? I mean, as I understand it, there's not a testimonial statement so as to trigger the confrontation clause. Well, breaking it down, the report itself is replete with statements, including the statements that... Yes, it's replete with statements, but some of them were machine-generated and some of them are not really testimonial, and I think that's what the presiding judge is asking. What non-machine state-generated parts of Accelerate are testimonial? Well, I want to start with the machine-generated premise, because... Yeah, that's a different issue, and it's an important one of whether machine-generated is covered by the confrontation clause or not, but you were saying something else, and let's separate the two arguments. Well, if Your Honor would like me to address testimonials first. Okay, I'll start with testimonial, and this is plainly testimonial under the controlling test in the Supreme Court in this Court, which is a primary purpose test. So if you're assuming their statements, the purpose of these statements was for use at a criminal trial. There's no other reason this report was created, and I took the government's response to only be contesting the testimonial issue, and I think that's very clear in terms of the purpose. Shifting to machine-generated, I want to be very clear, that comes from a Supreme Court case, Volkoming, but Volkoming never recognized an exception. It talked about machine-generated in the context of explaining why there was a violation through this substitute witness procedure. This Court's never recognized a machine-generated objection. We haven't decided that issue. We have a summary order that suggested it, and other circuits have recognized it, right? Yes, I know the government didn't make those arguments or cite those cases, but I agree with that. So in terms of thinking about when a report contains a machine-generated statement, I submit that these things are on a continuum, because when you're looking at a forensic technology, there's going to be interaction between the human analyst and the outputs of the machine, and that exists on a continuum. And Volkoming, again, talked about this when it was giving a hypothetical of a police report that records a radar gun readout, which it described as an objective fact. And Volkoming assumed or understood that having that radar gun readout, even though that's a machine-generated number, that gave rise to the same confrontation issue that we're talking about here. So there might be a case where you look at the technology and decide that there's just no real human interaction or input, but the government didn't even lay that foundation in terms of understanding the technology here. We have almost nothing. Isn't that where we are with this technology? I mean, isn't essentially this is an application that will produce the contents of the phone. So, I mean, there's no human intervention, like reading the readout and writing it down. This is just a spit-out of the phone contents, or am I misunderstanding the technology? Respectfully, I think it's more complicated than that. The record here doesn't speak to it, but if you look at other cases, the Lungi case that's discussed in the briefing, a different analyst, Mr. Santos, he testified that there is human interaction. The human operator makes decisions about how to organize the analysis. And what's important here is the potential for alteration. This spits out a PDF, but one of the things we would have wanted to question the testing analyst on is the potential to alter the PDF. That's exactly the type of questioning that Volkoming itself recognized is what the confrontation right goes to. They are similar to here. The testing analyst had gone on unpaid leave or left the law enforcement shortly before the trial, and the Volkoming court viewed that as exactly the type of thing the confrontation right is designed to give the defendant an opportunity to probe through cross-examination. So I think if this court doesn't want to take on the precise contours of machine-generated, that's fine. But in this case, the government did not have to proceed this way. There were a lot of paths available to the government when they were confronted with the situation of an analyst who left shortly before trial. One of the things, if you look at the Smith case, it talks about the role of experts in this type of situation, and it talked about there are some permissible forms of expert testimony. Here, the government is disclaiming Ms. Volchko as an expert. It's going at lengths to say she did not testify based on her expertise. That's itself an independent error, given that the rules are very clear that when any portion of testimony is based on specialized technical knowledge, and she talked not just about, I got this output from the machine, but she talked about cookies, P-lists, all sorts of things. I take it the key to this is the Navigant issue, and whether there was knowledge that Stuyvehouse was interested in buying Navigant as against something else. And that, the print, there is significant evidence in this report. But the evidence with respect to that seemed to me to be totally machine-generated. And we may have to decide then whether machine-generated is covered by the Supreme Court or not. Anything else in that report which is not machine-generated doesn't really go to the issue, does it? I mean, there were a couple of phone conversations, but they were to the side, weren't they? Yeah, the critical evidence relating to Navigant is the cookie, and it's the fact that the phone was restored and erased. I do think that you can't parse through the statements to determine whether this is machine-generated, because our point is we want to understand the potential for the analyst to have altered something. We have a cookie that says Navigant, did he make that up? I understand there was an intuition that's probably reliable, but it's really the same as Will Cumming, where that confrontation right gives us the ability to explore that in front of the jury. I just don't think that this is machine-generated in a way that distinguishes it from the type of testimony the court was talking about and Will Cumming, the objective fact, like a radar readout. You have an output of a machine and a report like this, I think there's an implicit attestation that it's accurate, produced through reliable methods. And why should the government be in a better position when it just has a printout without a certification, when we know from Bull, Cumming, and Smith that when they have a certification and more formality, they have to comply with a confrontation clause. We know even notes have to comply with the confrontation clause. Smith discussed notes, which didn't have a certification. So to approve this procedure, this sort of bank shot way of getting in a forensic report, its only relevance is if it was reliable and accurate. That's the only way it would have incriminated my client. And I think the Supreme Court has spoken to this on multiple occasions, every time they've disapproved circumvention and runs around the confrontation right through a substitute witness. Can you turn to the venue issue? Yes, I'm happy to address venue. The government again came up short. They rely on the fact that the New York Stock Exchange is headquartered, physically headquartered, close to where we are in the Southern District. But it's undisputed that the actual execution of the trades took place on servers in New Jersey. So the government relies on ancillary... I think the government is relying on the fact that these trades were settled in the Southern District of New York, either that or in the Eastern District of New York, and that it's almost random whether it was one or the other. But given the fact that it was done on an alternate basis or on a capacity basis, the odds are overwhelming that these trades were settled in Manhattan. Yes, they do make that argument. This Court, I don't think, has ever said and held that it's sufficient, but even on that front... Our cases on venue are incredibly broad, the language, and probably, my judgment, too broad. But this case may not push us to that extreme because of what Judge Jacobs has said, because of the evidence that the settlement was actually made in the appropriate venue. Well, the evidence that it was settled, it's attenuated. It's about... There's reference to load balancing and a single logical mainframe. There's no record as to the likelihood or factors that the servers consider in terms of whether the trades are routed through the Southern District and Eastern District. And I think a very important point here is venue is not just about what happens in fact. It's about reasonable expectations. I'm setting aside the fact that this was on the New York Stock Exchange. But are you saying it's a reasonable expectation when you trade on the New York Stock Exchange that the transaction will be accomplished in New Jersey? For execution, maybe not, but we're talking about settlement now. And if this Court's case is in Kalinsky, that distinguishes... You were talking about New Jersey, which is not the place of settlement. Right. And so what I'm saying is the reasonable expectation, you have to look at the part of the process the government is relying on for venue. So if we're talking about settlement, my client is an amateur investor. He hasn't thought about the settlement. In Kalinsky, you have statements or things in the record that refer to a clearing company that... And they also involve much more sophisticated investors, people who are in the securities industry. So, Judge Jacobs, I understand the intuition. It's on the New York Stock Exchange. But in fact, the exchange isn't what the government is relying on to establish venue. So when you're looking at these ancillary back office processes, I don't think any case of this Court has held... The government's relying on it because that's what one of our cases says. And like Judge Keller raising, I'm not sure it makes much sense, but that's... I would urge the Court to look at the cases, consider the sophistication of the investors that are being talked about before having a rule that any aspect of back office clearance and settlement, regardless of foreseeability or a record of foreseeability or knowledge as to an amateur investor, is sufficient for If we follow your approach, which may very well make more sense, where would venue lie? List the places. Possibly... Well, I think that New Jersey, where the trades were executed, I think... However sophisticated the investor is, they're not going to know where those servers are. There's evidence he placed the orders and the trades in both Indiana and Florida, so I think those would be clear. And I mean, if you're thinking of convenience and the factors that venue is about, my client is obviously an Indiana resident, a former congressman from Indiana, and that would certainly comport, I think, a lot more with the understandings of the purposes behind the venue and dissonance clauses. To have the trial there rather than the Southern District because of load balancings, simultaneous storage, it's just so attenuated. And the one thing this Court has said also in Geibel is we don't want a rule that gives the Southern District carte blanche over essentially every insider trading case. And I think that's what we're approaching respectively. Good morning, Your Honors. May it please the Court Jacob Fiddleman for the United States. This Court should affirm Booyer's conviction. I'd like to start with the confrontation clause issue. And I think the questions from the Court at the beginning of my adversary's argument go right to the heart of the matter. There were no statements by Mr. Duda being offered to the jury at all. So there's no need to evaluate the testimonial nature of any statements that that person may have made because none of his statements are being presented to the jury. This case looks nothing like the Supreme Court's confrontation clause cases, all of which involved documents in which a person was writing out what that person had seen, what that person had done, and what conclusions that person had reached. And that document was then being handed to the jury. That's a confrontation clause problem because that person is testifying in writing. Here, no statements by Mr. Duda were included in this document, which was a printout generated by a computer program to make it readable by a human of the contents of Mr. Stansbury's cell phone. And so it simply doesn't represent. Well, fundamentally, if you have a machine, you just have to have somebody say how the machine works and whether it's accurate. I mean, even in the speeding example, somebody has to say that the machine has been calibrated periodically and therefore accurately reflects the speed at which the defendant was driving. Well, I think, Your Honor, that questions about whether the resulting document is persuasive and could have problems, that goes to the weight of the evidence, not its admissibility under Rule 901 even, but certainly not with respect to whether or not it contains a testimony. But don't you have a question, if a person has done that, that you ought to be able to cross-examine that person as to how well he has done, she has done that? It certainly may be something of interest to the jury, how well... But more, I mean, I'm asking, you know, Supreme Court has gone very far in confrontation, much further than any of the circuits have done. And so I'm trying to figure out just what it is that they are doing. Would they want the person who tells you that this is so, even though this is machine-generated, to be there to be cross-examined? Or is it beyond what the jury has done? Your Honor, I think it's beyond what they've done. Because there is no person telling the jury that this is so. Unlike the radar... It is a person who had to generate the activity of the machine. Yes, Your Honor. But it's unlike the radar gun readout situation, where there's a person making a firsthand observation about what that radar gun says on it and writing it down. So the written-down numbers are, in fact, testimony of the machine said X. When the computer program prints out in a readable PDF form the contents of a computer hard drive, you know, a cell phone, that's just primary source evidence. It isn't statements being offered by the person who isn't there. And so it fundamentally looks just like any other chain of custody gap. Would it have been stronger, from the government's perspective, in terms of the strength of its evidence, to call the person who extracted it? Of course. But that doesn't... That relates to authenticity and Rule 901 and arguments to be made to the jury. I should also note, and I apologize that the cases weren't in our brief, but I know that Judge Calabresi mentioned them, but two other circuits have held that Cellebrite extractions do not contain statements of the extractor at all for Confrontation Clause purposes. Is it the government's position that the Confrontation Clause objection was preserved? So, thank you for raising that, Your Honor. Our view is it was not, but we understand that whether it's on plain error or not is a relatively close question in this circumstance, and so this Court need not decide which standard applies because there was no error in any event. The reason we feel it should be reviewed for plain error is because at the time, contemporaneously at the trial, two objections were raised. Rule 702, expertise, and Rule 901, authenticity. They were argued at the sidebar. They were overruled. Judge Berman later said, I would like briefs on those two issues. Simultaneous. Simultaneous briefing at 8 p.m. that evening. And in those simultaneous briefs, which the government's brief talked only about the two issues that had been directed by the Court, the defendant's brief included a single sentence that said, and, by the way, this violates the Confrontation Clause, with a citation to Bull coming. Well, it's a single sentence, but it's a sentence. It is a sentence, Your Honor, but absolutely, Your Honor. But it's outside the scope of what the directed, what the briefing was. Well, I know, but what, are we playing games or are we saying that this is something that the district court was made aware of? It's a fair question, Your Honor, and that's why we recognize that this, that's a, that's a close question, and this Court, even if this Court were to review the matter de novo, we, we actually think it's, it's, it's perfectly right for this Court to say that the, a Cellebrite printout does not contain statements of the analyst at all, and joining the Fourth and Fifth Circuits that have held that. How about if we address this as an authentication problem? I mean, your adversary says, essentially, this document comes into court. We don't have the analyst to actually ask the machine extractor, how do we know what the machine was asked to do? And it's authenticated with just IMEI number, which the briefing suggests, his briefing suggests, is equivalent to, oh, they have the same Social Security number on the top, this one document and the second document. So can you explain, I know we have a low bar for authentication, but can you explain what in the record allowed a jury reasonably to conclude this is what the government was saying that it was? Yes, Your Honor. And, and I, I think an IMEI number is not like a Social Security number because a Social Security number involves someone writing it down. An IMEI number is machine extracted and it's a unique identifier for the device. So here, the jury observed that the computer-generated printout contained the unique IMEI number, the assigned phone number, the date of the extraction, which was the date that GuideHouse cloned Mr. Stansbury's phone, as well as the, the internal label of the phone, Chris's iPhone. And all of that data, with the exception of Chris's iPhone, which I think was listed on the form as Chris Stansbury, but all of that data matched the records that were in evidence for their truth about the other end of the chain of custody, what device had been imaged. And so all of that is machine-generated and that essentially rendered the document sufficiently self-authenticating that there were enough data points there for the jury to possibly conclude that this is, in fact, just a PDF printout of the phone's contents. So often in authentication situations, we say it's up to the district court's discretion and it goes to the weight of the evidence rather than whether it is admissible or not. I find that way of thinking difficult in this situation because it either is or is not. So I'm not quite sure how one can make it be a matter of weight. We either have to agree with you that it is sufficiently authenticated and that it's there. Am I wrong? I understand Your Honor's point, which is what we're, what we're actually being asked is, was the quantum of evidence presented sufficient to allow the district judge to conclude that it should go to the jury, right? Because the jury clearly concluded, based on the evidence before it, that this was, in fact, the contents of Mr. Stansbury's cell phone. And so what this Court is being asked to do is to determine that Judge Berman abused his discretion in concluding that that evidence was sufficient to even let the jury make the decision. Here the jury was the one who decided. There was no — Was your evidence sufficient without the Cellebrite report? Because, you know, the Cellebrite report is the only thing I think that says that Mr. Stansbury wiped his cell contents, which is very suggestive. So — I think it may have been emphasized by the prosecution. It was mentioned one time in the closing, which was otherwise a lengthy closing argument. But I appreciate the question, Your Honor. It is quite clear that even if admission of this Cellebrite printout was error, it was harmless, beyond a reasonable doubt, certainly. So, again, the Court need not — I have problems with that because it really is this that suggests that Guidehouse knew what it was and said what it was that was being bought, rather than that there was something general. And then we have the question of whether it spills over to the Sprint, and that might be very easy, but for your argument at the end that, after all, there were two cases, and that goes to intent, and that goes to the — to the spillover issue. Yes, Your Honor. It wasn't the only, or indeed the central, evidence of the identity of Navigant as the target. In fact, Mr. Booyer's own searches, evidence was in the record reflecting that the defendant had searched for Navigant on June 12th, hours after talking to Mr. Stansbury. So this data was evidence that Mr. Stansbury, the tipper, had run a similar search. But the evidence was still in the record that the defendant had run that very same search, in fact, days before this evidence. On June 12th? On June 12th, yes. So the timeline here is that on June 12th, Harkness spoke to Stansbury, and I know there's a lot of names here, but Harkness spoke to Stansbury, referencing synergies and a combination, and Stansbury immediately called Booyer, right? And Booyer was a consultant for the company. Immediately called Booyer on June 12th, 2019. There are a bunch of communications between the two that evening. That night, Booyer searched for Navigant's stock symbol, and that's Appendix 549 in Government Exhibit 909. It was after midnight. It was after midnight. It was the next morning, right. And then the next sort of morning proper is when the defendant buys the stock. So the fact that several days later, some evidence from Stansbury's phone reflected that Stansbury also searched for this stock is, it is certainly evidence, and that's why the government offered it, but it can't fairly be described as the core reason why the jury knew or could conclude that Booyer knew the intended target of the merger. So it really was limited to… These searches are available to us from the Sellebright report. The searches of Mr. Booyer's searches? Yes. No, they're… No, because it's… They're available from other sources in the record.  Right. So it's not the Sellebright report. Correct, Your Honor. The Sellebright report is a report of Mr. Stansbury's cell phone, and it reflects what Mr. Stansbury did on his cell phone. The evidence of what Mr. Booyer searched for is coming from other places, Mr. Booyer's various accounts. So that search by Mr. Booyer the following morning or after midnight comes from another source.  Unaffected by the introduction of the Sellebright printout. And that's the theme here, is that the Sellebright printout corroborated certain things or actions that Mr. Stansbury took at various points, but the real core evidence about what Mr. Booyer did didn't come from it at all. It was introduced for three things. The first one is what we've discussed, the search that Stansbury engaged in, which, by the way, was, in addition to being unrelated to Mr. Booyer, was essentially duplicative of uncontested evidence from Mr. Stansbury's Google account, which was a separate source of evidence showing that he had engaged in similar searches several days and weeks later. The second thing that the Sellebright report was used for was to show text messages between Stansbury and another person, Sofer, arranging to meet for dinner on June 19th. But Mr. Sofer testified that that dinner occurred. So that's essentially completely immaterial. And then the third piece is that Mr. Stansbury restored his cell phone from a backup on June 13th, 2019. And the government argued that that reflected some consciousness of guilt on behalf of Mr. Stansbury. The defense effectively undermined that evidence by eliciting testimony that people can restore the settings on their phones from backups for a variety of reasons, and there's no evidence as to what may or may not have been deleted. And in any event — So when he wiped his phone, he did not make it impossible to restore what had been  I'm not sure what's in the record about that, but in any event, it relates to Mr. Booyer's mindset. It's not Booyer wiping his phone, which could be viewed as a much more central — You did not argue that that reflected Booyer's state of mind. We did not. And I think that would be an extended inference that would probably open us up to a defense argument on summation to the contrary. So in short, Your Honors, there's no confrontation clause issue here. I'll briefly turn to venue. We take Your Honors' points about the breadth of this Court's holdings, but the bottom line is, as Judge Jacobs mentioned, the cases say what they say. And we think that rule makes sense. The stock exchanges are located here. New York Stock Exchange still has an active trading floor here. And so when a person trades a stock on the New York Stock Exchange, they're using an instrumentality of commerce that is located here. Yeah, but we might well, at some point, want to question the breadth of those statements. They're there, but we might well want to question, because it does mean that every single insider trading then gets put to a southern district, and that may not be desirable in terms of what venue is there or not. So I would like to understand. We can all agree they're there, but we can question in different ways. I'd like you to argue why this case is not a good one for us to raise that question, because there is venue here on narrower grounds. Yes, Your Honor, and we agree. This is not the case for any reevaluation of that case law, the same way that in the most recent decision, Chao, there was a bunch of additional other evidence as well. So here, one of the executing brokers, Virtu, was located in Manhattan, and the trades were being monitored by employees. There was a data center. Part of Virtu's process in connecting the trades to clearance and settlement ran through a data center in Purchase, which is in Westchester in this district, in the southern district of New York. The selling broker for some of the Navigant trades was located in Manhattan with monitoring employees. That's Two Sigma. And then what, Judge Jacobs, you asked about was the settlement component of the trade, and trades have execution, clearance, and settlement, and those are all critical steps that are all triggered when you trade a stock. Settlement occurred by an organization called DTCC. And first of all, the DTCC command center, in which the entire system is being monitored, is located in Manhattan. But second of all, DTCC's settlement computer system is a single mainframe computer that is split across the southern and eastern districts of New York. And so instructions come into that system, and inside the computer system, the sort of subunit that does the technical processing, it routes individual trades to one of the subprocessors that happens to either be on one side or the other of the river, but in any event, when the processing is done, the results of that sub-step are then sent back up to the central mainframe and recorded on both halves of the computer system. And so as a first step, the settlement happened simultaneously in both southern and eastern. That may be a way to resolve the venue problem, but it's no way to run a railroad. It's a fair point, Your Honor. So which parts of your analysis would be foreseeable to a defendant? Well, Your Honor, I think what's foreseeable is that when you engage in a trade on the New York Stock Exchange, right, I think the average person would assume that that is going to trigger a line of events that involves things happening in the location of that New York Stock Exchange. And so even if you're not — if this Court is not prepared to rely on the prior precedent that the location of the exchange is itself conduct occurring here, it certainly satisfies the foreseeability aspects of venue. You say that if then something happens, that was foreseeable. That's right, Your Honor, because anyone who trades on the New York Stock Exchange reasonably understands that something could happen in the southern district of New York. And then when something does happen in that district, it is of no surprise to the average trader. And so fundamentally we agree with Your Honor that this is not the right vehicle to reexamine the Chao line of cases, although the Court has quite recently reaffirmed it in 2021 with respect to, in fact, the NASDAQ, which has always been a virtual platform and has never had a physical trading floor like the Stock Exchange still has today. So for these reasons, unless the Court has any other questions, the conviction should be affirmed. Will you rebuttal? Thank you. A few points. Starting with authentication, this is sort of the flip side of the confrontation issue, and the government, I think, is trying to have it both ways. They're arguing that they're outside the confrontation clause because there's no certification, but at the same time they're insisting the report was authenticated because somehow there is enough in the record to give assurances to the reliability of the process. And that's referred to in Rule 901 as a grounds for authenticating a process or system. I don't think they can have it both ways, and the government's position on this has been a moving target. At trial they didn't explain how Celebrite works. We had some accounts from my colleague about how it works, but they didn't put that before the jury. That wasn't there for the Court to understand whether it is I saw the machine said X or whether there is more interaction with the analyst. We didn't have the analyst who performed this report there to probe that, so I think they're reinforcing errors as to both confrontation and authentication. There is a reference to self-authentication. That's governed by a separate rule. It requires a certification. There's no argument that this is self-authenticating under the rules. On preservation, I think it's telling that the government joined issue with us on confrontation when we were litigating the bail motion in the District Court. The first time there was a claim there was some surprise or preservation issue was in this court in the bail motion. If they felt surprised by the simultaneous briefing, they could have said something in any of those several months. On harmless error, I think some of the questions appreciated that this evidence was critical because the government's whole Navigant theory turned on Stansbury and whether Stansbury was able to figure it out. That was the essential link in the chain. They're relying on an email. It has these cryptic references, unexplained references to combinations and synergy. The government, Stansbury, did not testify. There's no other testimony that Stansbury saw that part of the email, told my client about it. That's why it's very important to the government to be able to tell the jury to infer that Stansbury figured it out and then told my client. The cookie is essential to that because it's close in time to those emails. The Google result, that's from months later, over a month later, so it's not as close in time. The government relied on both the restore and the cookie in its summation. The government is going to such lengths to get this evidence in through this unorthodox procedure precisely because it's so important. On the harmless beyond a reasonable doubt standard, in this entirely circumstantial, highly inferential case where everything turns on what Mr. Stansbury was able to figure out, I don't think it can be concluded that any error was harmless beyond a reasonable doubt. Thank you. Thank you. Very well argued. Very well argued.